Donald J. WYLIE, Plaintiff–Appellee,

v.

The MARLEY COMPANY,
Defendant–Appellant.

No. 85–2368.

United States Court of Appeals,
Tenth Circuit.

Dec. 18, 1989.

**1464**

David M. Ebel, Davis, Graham & Stubbs, Denver, Colo. (Alan M. Loeb, Catherine S. Martinez, and Allan L. Hale, Davis, Graham & Stubbs, Denver, Colo., Timothy J. Verhagen, Mission, Kan., and Roger D. Stanton, Stinson, Mag & Fizzell, Overland Park, Kan., were also on the briefs), for defendant-appellant.

David L. Welte, Polsinelli, White & Vardeman, Kansas City, Mo. (Mark J. Bredemeier, Polsinelli, White & Vardeman, Kansas City, Mo., was also on the brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, McKAY, Circuit Judge, and BURCIAGA, District Judge *.

HOLLOWAY, Chief Judge.

I.

This is an appeal in a diversity action brought by Donald Wylie ("Wylie") against The Marley Company ("Marley") for breach of an employment agreement and for declaratory judgment for breach of contract. Wylie claimed compensatory damages in the amount of $1,329,452 for lost wages and the value of lost compensation and benefits through the termination date of the agreement. Marley answered denying liability and asserting in numerous defenses that Wylie had repudiated the employment agreement, 1 R.Doc. 15; and at trial Marley offered evidence seeking to establish that Wylie orally resigned. Marley also asserted affirmative defenses, including waiver, estoppel, quasi-estoppel, repudiation, mutual rescission and failure of consideration. The jury returned a verdict for Wylie for $1,329,424 and judgment was entered for him. The judgment was increased $341,705 to award prejudgment interest.

Marley appeals and claims that the district court erred by instructing the jury that any resignation by Wylie must have been in writing, by excluding certain testimony as falling within the attorney-client

* The Honorable Juan G. Burciaga, United States District Judge for the District of New Mexico, sitting by designation.

privilege, by failing to instruct the jury on two of its affirmative defenses, and by awarding Wylie prejudgment interest from the date of the breach to the date judgment was entered on the total amount of the verdict, while under the agreement in the event of a breach, Wylie was to receive his semi-monthly payments when they became due. We reverse and remand for a new trial, while upholding some rulings of the trial court.

II.

Wylie began work for Marley in 1955. In 1977 or 1978, after working at various positions in the company, Wylie was elected an executive vice president by the board of directors. Shortly thereafter Wylie executed an employment contract under which he was to be employed by Marley as its executive vice president for a term of ten years, ending in September 1988.

In 1981 Kohlberg, Kravis & Roberts ("KKR"), a general partnership engaged in investment banking, made Marley a private company through a leveraged buyout that resulted in KKR's owning or representing a controlling shareholder interest in Marley's stock. Shortly thereafter, KKR formed MC Acquisition Company, a privately held corporation, for the exclusive purpose of acquiring Marley's assets. It was an objective of KKR to keep the present top management in place, and new or revised employment contracts were negotiated with "old" Marley's top management, including Wylie.

Immediately after the closing, MC Acquisition was renamed "The Marley Company." On April 28, 1981, MC Acquisition and Wylie entered into a new employment agreement which basically reiterated the terms of the old contract. Wylie was to continue his employment in the capacity of Marley's executive vice president and carry out the responsibilities contained in Corporate Policy C–20, for a term ending December 31, 1988. Furthermore, pursuant to his employment agreement Wylie was elected to Marley's board of directors. Paragraph 3 of the April 28, 1981 employment agreement provided:

> During the term of this Agreement, the Employee [Wylie] shall hold the title of Executive Vice President and shall be assigned to and have the responsibilities set forth in Company's corporate policy C–20 as now existing or as altered after this date by Company's Chairman of the Board. During the term of this Agreement the responsibilities assigned to [Wylie] shall be of an executive nature consistent with [Wylie's] job title, background, and expertise and of a nature appropriate to be assigned to a top level management executive. [Wylie] shall be elected to the Board of Directors of Company. [Wylie] will report directly to the chief executive officer(s) of Company.

Addendum to Appellant's Brief, doc. B, pp. 3–4. Corporate policy C–20, mentioned above, refers generally to the basic responsibilities of Marley's senior executives, and specifically to Wylie's responsibility for financial and facilities long-range planning, customer relations, Marley inter-company relations, implementation of policy and objectives, and executive management committee activities. Addendum to Appellee's Brief, doc. III.

Paragraph 7 of the Agreement set forth the responsibilities and duties of each party in the event either party breached the contract:

> In the event Company shall fail or refuse to perform its obligations or carry out its duties under this Agreement, [Wylie] shall notify Company in writing of such failure or refusal, specifying the defaults alleged. Unless such defaults shall promptly (within thirty days of receipt of such notice) be corrected, then [Wylie] shall be entitled, upon written notice of termination to Company, to declare this Agreement breached, to terminate further performance hereunder, and thereupon shall be released from any further obligation under this Agreement; provided, however, that such termination shall be without prejudice to [Wylie's] rights to continue to receive annually (in semi-monthly installments), for the remainder of the term of this Agreement (without reduction by reason of other

employment and as though such termination had not occurred), his full base salary at the rate in effect at the time of termination plus an annual amount equal to the highest yearly amount of incentive compensation previously paid under the Agreement to [Wylie], or if none has been paid at the time of termination, in the amount paid by Marley to [Wylie] in January of 1981.

Addendum to Appellant's Brief, doc. B, p. 5. Paragraph 7(b), like subpart (a), similarly provided that if Wylie failed or refused to perform under the terms of the agreement, Marley must provide Wylie notice and an opportunity to cure any defects before it could declare the contract in breach.[1] *Id.* Paragraph 15 of the agreement stipulated that the agreement and the legal relations thereunder "shall be governed by the laws of the State of Kansas."

A regularly scheduled meeting of Marley's Board of Directors on December 7, 1982, set the events in motion for this suit. Attending this meeting were Wylie and Richard Powell, Robert McFadin, and Richard Signorelli, three directors representing the KKR interest and other directors representing Marley's management. Powell was Chairman of the Board and a member of the executive committee. McFadin was President and Chief Executive Officer of Marley. Prior to the meeting Signorelli was a senior vice president.

At the meeting McFadin nominated Signorelli to be a second executive vice president. After the meeting Wylie met with Powell to discuss the situation. Wylie believed that his job title had been diminished and that he was going to be seriously affected by Signorelli's promotion. Powell arranged a meeting between McFadin and Wylie for the following morning.

On the morning of December 8, 1982, Wylie met with McFadin and Powell in McFadin's office. What was discussed at this meeting is sharply disputed. Wylie stated that the promotion of Signorelli breached his employment agreement, that he was disturbed by the promotion, and that he was going to discuss his concerns with KKR representatives in San Franciso. Wylie testified that he also told McFadin that he "couldn't see any way it could work" and "that it would be very difficult to work with two executive vice presidents." 3 R. 146–47. McFadin testified that Wylie told him that "he could no longer work for the Marley Company under the condition of there being a second executive vice president." 4 R. 251. Although McFadin understood this to mean that Wylie wanted to resign, 4 R. 252, McFadin testified that Wylie never stated that he was going to resign or quit. 4 R. 262. Wylie testified he never said he was going to resign or quit, 3 R. 147, nor that McFadin stated he would accept his resignation. 3 R. 148.

Later that same day Wylie contacted Robert MacDonnell, general partner for KKR, to discuss the Signorelli promotion. MacDonnell testified that Wylie told him that he had resigned. 4 R. 287–88. Wylie denied this.[2] 3 R. 149–50. The next day Wylie visited with MacDonnell in San Francisco. MacDonnell testified that there Wylie again stated that he had resigned. 4 R. 290.

When Wylie returned to Kansas City from his meeting with MacDonnell, he received a letter dated December 8 from McFadin stating that McFadin had "accepted [his] resignation." 1 R.Doc. 7, Ex. D. In response to the McFadin letter, Wylie wrote a letter to Powell, as Chairman of the Board, that Marley was in breach of its employment agreement, and denying that he resigned. Wylie also made formal demand to cure the contractual defaults as required by the employment agreement. When Marley failed to cure the defaults as

---

1. The agreement contains no language concerning the procedures for effectuating or accepting a resignation.

2. On the question whether Wylie had resigned, there was also a proffer of testimony of Mr. Wrobel, which was excluded. Wrobel, General Counsel and Chief Legal Officer for Marley, would have testified that Wylie called him and during the communication said it probably would not surprise Wrobel to know that he, Wylie, had resigned. This testimony was rejected for reasons discussed below in Part III B.

requested, Wylie sent another letter to both Marley and KKR stating that the employment agreement was terminated and that any reliance on an oral resignation was invalid as a matter of law. Shortly thereafter, Wylie initiated this action.

Prior to trial, Wylie filed a motion for partial summary judgment on the ground that under applicable Kansas corporation law, he could not orally resign as executive vice president or as a director of Marley. Therefore, Wylie asserted that Marley's uncontroverted conduct breached the Employment Agreement and constituted wrongful discharge. The trial court denied Wylie's motion as to the wrongful discharge issue due to disputed material questions of fact surrounding Marley's affirmative defenses. However, the trial court did rule that under Kansas law an effective resignation by a corporate director or officer must be "unequivocal, in writing, and communicated to the corporation." 2 R.Doc. 103, pp. 3–6. In addition, the trial court ruled that if Marley showed that Wylie induced Marley to believe that he resigned, and Marley relied on that inducement to its prejudice, Wylie would be estopped from asserting that a resignation was required to be in writing to be effective. 2 R.Doc. 103, p. 7.

Wylie also filed a motion in limine to exclude communications between himself and Robert Wrobel, the General Counsel and Chief Legal Officer of Marley at the time of the controversy over Signorelli's designation as a second executive vice-president. Wrobel had previously represented Wylie in the negotiation of his employment agreement with MC Acquisition Company. This motion sought to exclude testimony from Wrobel regarding the conversation between Wrobel and Wylie in which Wylie

allegedly made reference to having resigned. The trial court granted Wylie's motion to exclude Wrobel's testimony on this subject.

The ensuing trial resulted in a jury verdict for Wylie for $1,329,424, on which judgment was entered. Wylie moved to amend the judgment to include prejudgment interest, as allowed by Kansas law, in the amount of $341,705. Marley also filed post-trial motions for judgment notwithstanding the verdict and for a new trial. The district court granted Wylie's motion to amend judgment and denied both of Marley's motions. An amended judgment reflecting prejudgment interest was filed and this appeal followed.

### III

#### A.

Marley argues the district court erred in instructing the jury that Wylie's resignation had to be in writing to be effective under Kansas law. Marley contends that pursuant to Kan.Stat.Ann. § 17–6302(a) (1981),[3] a resignation by a corporate officer need not be submitted exclusively in writing. Rather, Marley suggests that the statute is permissive and states only that an unequivocal intention to resign is required. Marley argues that the trial court erred in submitting Instruction No. 11 which stated that a corporate officer can only effectively resign in writing. We agree.

The trial court instructed the jury that:

The plaintiff and defendant entered into an employment contract wherein defendant agreed to compensate plaintiff as its executive vice-president until Dec. 31, 1988. Under the law of the state of Kansas applicable to this case, the resig-

**3.** Kan.Stat.Ann. § 17–6302(a)(1981) provides in part:

Officers; manner of selection; terms of office; resignation; duties; failure to elect; vacancies; not for profit, non-stock corporations. (a) Every corporation organized under this act shall have a president, secretary and treasurer, who shall be chosen as the bylaws may direct. Each officer shall hold his office until his successor is elected and qualified or until his earlier resignation or removal. Any

officer may resign at any time upon written notice to the corporation....

The statutory provision pertaining to director resignations is the same. *See* Kan.Stat.Ann. § 17–6301(b) (1981). Both of these provisions are patterned after Del.Code Ann. tit. 8 §§ 141(b) and 142. The organization of the statutory provisions was later revised in 1988, but their substance remained the same. Kan. Stat.Ann. §§ 17–6302(b) & 17–6301 (1988).

nation of a corporate officer such as plaintiff, to be effective, must be in writing, unequivocal, and communicated to the corporation.

Because the alleged resignation of plaintiff was not in writing, you must find for the plaintiff unless defendant has established as more probably true than not true one of its affirmative defenses.

II R. 121, Instr. No. 11.

In his order granting partial summary judgment on the resignation issue, the district court, in the absence of any Kansas authority, looked to Delaware law for guidance in interpreting § 17–6302(b) since Kansas adopted the statute from the Delaware code. *Woodring v. Hall*, 200 Kan. 597, 438 P.2d 135, 140 (1968); *State ex rel. Carrington v. Shutts*, 217 Kan. 175, 535 P.2d 982, 985–86 (1975). The district court relied primarily on *Dillon v. Berg*, 326 F.Supp. 1214 (Del.), *aff'd*, 453 F.2d 876 (3rd Cir.1971) (per curiam),[4] which construed the Delaware statute concerning resignations of corporate directors, stating:

> The legislative history of the phrase, "Any director may resign at any time upon written notice to the corporation," indicates that the purpose of this provision was to prevent a corporate director who desired to resign from having his status placed in doubt by a refusal or failure of the Board to act. The logical interpretation of the provision is that acceptance is no longer essential to effect a valid resignation by a director.
>
> From the requirements of 8 Del.C. § 141(b) it can also be inferred that it was the policy of this legislation that a resignation be unequivocal, in writing and that it be communicated to the corporation. The necessity for written notice to the corporation before a director's resignation becomes effective clearly indicates an intent to outlaw secret, covert resignations in order to enable the other directors to know at all times the status of their fellow directors. Therefore, the Court interprets the phrase "written no-

tice to the corporation," used in 8 Del.C. § 142(b) in connection with the resignation of a director, to mean actual written notice to each and every member of the Board of Directors or actual written notice to an agent of the corporation, such as its Chairman of the Board, President, or Secretary.

326 F.Supp. at 1223–24. *See also, Rare Earth, Inc. v. Hoorelbeke*, 401 F.Supp. 26, 31–32 (S.D.N.Y.1975) (same requirement under Michigan law).

The *Dillon* case arose in a stockholders' derivative suit. There was a controversy as to alleged illegality of a stockholders' meeting due to misleading information in proxy solicitations. This in turn concerned the validity of a purported resignation of a director, Power, which was made by a written but undated secret resignation obtained by another director, Berg. Power later sought to withdraw the undated secret resignation but Berg back-dated the resignation and sent out word to the other directors of the resignation. As stated in the reasoning quoted above, the federal district court in *Dillon* held that such a purported resignation was void because it was obtained by means of an illegal agreement and the statute required such a resignation to be unequivocal, in writing, and communicated to the corporation. 326 F.Supp. at 1224. Accordingly the proxy information omitting Power's name was a violation of securities regulations.

At one point the *Dillon* opinion pointed out that the legislative history of the proviso on written resignations indicated that the statute's purpose "was to prevent a corporate director who desired to resign from having his status placed in doubt by a refusal or failure of the Board to act." 326 F.Supp. at 1223. Another purpose was noted of outlawing secret, covert resignations and to enable other directors to know the status of their fellow directors. *Id.*

█ Despite the *Dillon* opinion by the federal district court in Delaware, we are

---

**4.** The court of appeals did not discuss the reasoning of the federal trial court on the interpretation of the Delaware statute, stating only that

in the circumstances, "we agree that the purported resignation of Power was not effective." 453 F.2d at 877.

persuaded that the Kansas statute should be construed to provide, in our circumstances, an elective procedure by which a corporate officer "may resign at any time upon written notice to the corporation," but that the provision is not mandatory and exclusive if the officer intends to resign and does state his intention to the corporation. In interpreting an identical provision of Delaware law (Del.C.Ann. tit. 8 § 141(b)), the Delaware Court of Chancery said, in dictum, that, if required to rule on the point, it would be inclined to hold against the party arguing that only a written resignation was effective; the statutory language can be construed as permissive rather than mandatory; the purpose of the language was to provide a means for a resignation to become effective at a director's election rather than to require acceptance by the corporation; and the court could conceive of circumstances where a completely illogical result would follow from refusing to recognize an oral resignation clearly given. *Bachmann v. Ontell,* 1984 WL 8245 (Del.Ch.1984), 10 Del.J. Corp.L 149. We feel the *Bachmann* opinion and its dictum are persuasive views here.

Furthermore, comment on the Delaware statute dealing with resignations states that the purpose of the written resignation requirement was to prevent a corporate director "who desired to resign, from having his status placed in doubt by a refusal or failure of the board to act," citing *Dillon.* 1 Folk, *Folk on the Delaware General Corporation Law* § 141.5.2 p. 132 (1988 ed.). Moreover, other comment discussing the Delaware statute and *Dillon* has said that the proviso *"does not preclude a director from resigning orally,* but an oral resignation may not be effective until its acceptance by the board on behalf of the corporation." 1 Ballotti and Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 4.5 p. 69 and note 109, citing cases (1988 Supp.) (emphasis added). *See also* 1 H. Marsh, *Marsh's California Corporation Law* §§ 8.7, p. 427 and 8.23, p. 455 (2nd ed. Supp.1988) (California Corporation Code provisions on resignation by directors and officers, identical to those of Delaware and Kansas, interpreted by principal draftsman as not specifying an exclusive manner of resignation; "[t]he purpose of this provision is to provide a method by which an officer may resign and terminate his capacity as such with certainty."

In *B.F. Goodrich v. Helena Motor Car Co.,* 165 P. 454 (Mont.1917), a corporation statute was construed which similarly provided that any director, trustee or officer of a corporation "may resign his office" by delivering to the corporate secretary or president his written resignation, and filing the resignation in the office of the clerk and recorder of the county. A written resignation was only given to the president. The Montana Court held that under the common law, this was sufficient and that the additional step of filing with the county clerk and recorder was part of "a mode which is permissive." 165 P. at 455.

We are convinced that the interpretation of the Kansas statutory provision on resignation of officers, Kan.Stat.Ann. § 17–6302(a), by the trial judge and the instruction based on his interpretation were in error. We hold that the statute does not make written resignations the mandatory and exclusive means for an officer to resign, and that instead he may do so by other means than the elective provision in the statute for written resignations. In accord with common law, he may also resign by oral communications or other actions which are sufficient to show his intent to resign.

In defense of the judgment in his favor, Wylie further strenuously argues that in any event the evidence was insufficient to establish that he resigned orally. He says that the burden of proof on this issue was on Marley. Thus there was no justification for giving an instruction on the question whether Wylie orally resigned, and in any event no error by the instruction that a resignation had to be in writing.

On review of the present record and in light of the interpretation of Kansas law we have made, we hold that there was a jury issue on the question of resignation

having been made orally by Wylie. He has pled the agreement between himself and Marley and that the company breached the agreement by locking him out of his office, by refusing to allow him to continue in his position, and by refusing to make the payments agreed on in the employment contract. He had the burden of proof on the essential elements of his contract claim, with Marley having the burden of proof on the affirmative defense of repudiation by resignation and other affirmative defenses. *See* Fed.R.Civ.P. 8(c); *see also Modern Heat & Power Co. v. Bishop Steamotor Corporation,* 34 N.W.2d 581, 584 (Iowa 1948) (burden of proving resignation falls on party asserting the claim); *Patient Care Services v. Segal,* 32 Ill.App.3d 1021, 337 N.E.2d 471, 478 (1975) (same). We feel that the evidence was sufficient, particularly from the testimony of Mr. McFadin, Mr. MacDonnell, and Mr. Powell, to raise a substantial fact issue on the contention by Marley that Wylie resigned orally.

■ Wylie also argues that, in any event, on this record Instruction No. 11 on a written resignation being required was not reversible error. He says the jury did consider and rejected Marley's contentions and evidence concerning the repudiation and estoppel defenses. It is true that these affirmative defenses were submitted along with the testimony on oral statements of Wylie which allegedly amounted to a resignation. However, the repudiation and estoppel affirmative defenses, as submitted, carried some added burdens of proof for Marley, beyond the resignation issue itself, in order for Marley to establish these defenses. We cannot determine how much damage the erroneous Instruction caused. We cannot hold that the error in instruction No. 11 was harmless.

Accordingly we hold that Instruction No. 11—that under Kansas law a resignation had to be in writing—was prejudicial error and that on remand the court should give an instruction consistent with this opinion, in substance that a corporate officer or director may resign in writing as the statute permits, or by oral communications or actions showing his intention to resign.

**B.**

Defendant Marley contends that the trial judge erred in refusing to give requested instructions on its defenses of quasi-estoppel and waiver. It says the evidence and Kansas law supported such theories so that the refusal to charge on the defenses was reversible error, citing *Delano v. Kitch,* 542 F.2d 550, 554 (10th Cir.1976), *appeal following remand,* 663 F.2d 990 (10th Cir. 1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982). Although the trial court never explained its reasoning for not instructing the jury on Marley's defense of quasi-estoppel and waiver, we need to address Marley's contention.

■ We must agree that on retrial such defenses should be covered by the instructions if they are supported by the evidence at the new trial. The showing for a quasi-estoppel defense was not strong, but Marley should be allowed to attempt an adequate showing on the defense theory of quasi-estoppel, at the new trial. Even though some elements of a true estoppel are lacking, a quasi-estoppel defense may be asserted under Kansas law by showing "the previous assertion of a position so inconsistent with the one now taken as to make the present claim unconscionable." *Fast v. Fast,* 209 Kan. 24, 496 P.2d 171, 175 (1972).

■ Likewise, we feel that the defense of repudiation and resignation is sufficiently distinguishable from Marley's theory of a waiver defense that the latter theory should be covered by an instruction if the elements for a waiver defense under Kansas law are shown on the new trial. "Waiver in contract law implies that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive action or inaction which is inconsistent with the contractual right. . . . , Once it has been established that a right has been waived, the party possessing the contractual right is precluded from asserting it in a court of law." *United American State Bank & Trust Co. v. Wild West Chrysler Plym-*

*outh, Inc.,* 221 Kan. 523, 561 P.2d 792, 795 (1977). This is sufficiently distinguishable from repudiation by resignation that with evidence to support it at retrial, the defense should be covered by an instruction. The abandonment or repudiation of a contract under Kansas law is placing oneself, by voluntary act, in a position so that he is unable to fulfill his part of the agreement, which may be treated as an anticipatory breach, with the result that the other party may thereupon rescind it. *Jinnings v. Amend,* 101 Kan. 130, 165 P. 845, 846 (1917).

For guidance of the trial court on retrial, which we hold must be allowed, we thus comment on these two defense instructions which should be given if supported by evidence at the new trial.

### C.

Marley also argues that the trial court erred in granting Wylie's motion in limine, thus excluding the testimony of Robert Wrobel, Marley's General Counsel and Chief Legal Officer, on the grounds of attorney-client privilege. The substance of Wrobel's testimony in question concerned a phone conversation with Wylie in which Wylie allegedly stated "I guess you won't be surprised to learn that I resigned this morning." Addendum to Appellant's Brief, Doc. G (Wrobel's Affidavit in response to Wylie's motion in limine). Marley asserts that the district court's exclusion of Wrobel's testimony under the attorney-client privilege was error. Marley also says the ruling was prejudicial in that Wrobel's testimony would have clearly proven Wylie's resignation and was relevant to Marley's affirmative defenses. Additionally, Marley asserts that Wrobel's testimony would have impeached Wylie's testimony that he never intended to resign.

■ The district court, in addressing Wylie's motion in limine, correctly noted that Kansas law controls whether the attorney-client privilege is applicable. Fed.R.

Evid. 501; *Mfg. Systems, Inc. of Milwaukee v. Computer Tech.,* 99 F.R.D. 335, 337 (E.D.Wisc.1983); *New York Underwriters Ins. Co. v. Union Construction Co.,* 285 F.Supp. 868, 869 (D.Kan.1968).[5] After reviewing the affidavits of both Wylie and Wrobel, the trial court determined that Wylie "could have believed that he could turn to [Wrobel] who negotiated his [employment] contract for the purpose of securing legal advice in the course of their relationship and in confidence." 2 R.Doc. 84, p. 4. The professional relationship for purposes of the privilege hinges upon the belief that one is consulting a lawyer and his intention to seek legal advice. *See Westinghouse Electric Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311, 1319 (7th Cir.1978); *MCCORMICK ON EVIDENCE,* § 88 (3rd ed.1984). The trial court also held that Wrobel's legal position with Marley was one which could have confused Wylie, and as a result, it would have been unfair to allow Wrobel to use Wylie's communications to Wrobel against him as a result of their attorney-client relationship. 2 R., Doc. 84, pp. 4–5. On review of the present record, we hold the district court's ruling was not clearly erroneous or an abuse of discretion.

■ Wrobel represented members of Old Marley's senior management, including Wylie, in connection with employment contract negotiations with New Marley. 2 R. doc. 84, p. 2, ¶ 3. In this context, Wylie and Wrobel were involved in an attorney-client relationship. *Id.* As a result of Wrobel's negotiations, Wylie's contract was extended to a term longer than the other senior management individuals. *Id.;* 1 R. doc. 75 (affidavit of Donald J. Wylie, ¶ 3). Upon Wrobel's appointment as General Counsel and Chief Legal Officer of New Marley, he followed a practice of not giving personal legal advice to officers and employees of Old Marley. 2 R. doc. 84, pp. 2–3, ¶ 5.

Both Wrobel and Wylie admit that they had a working relationship and had numer-

---

**5.** Kan.Stat.Ann. § 60–426(a) (1983) states in pertinent part:

"... communications found by the judge to have been between lawyer and his or her client in the course of that relationship and in professional confidence, are privileged...."

ous conversations; however, they disagree as to their content. Wylie claims that these conversations touched upon matters concerning his employment agreement. Wrobel denied that he offered or was requested to offer legal advice with respect to the employment agreement. *Id.* at ¶ 6. Wylie, in a phone conversation with Wrobel, allegedly inquired as to what his rights were under the employment contract, mentioned that he resigned, and sought legal representation from Wrobel. *Id.* at ¶ 7. Wylie said he believed that Wrobel was still his attorney and that his conversation was confidential. *Id.* Both Wylie and Wrobel agree that during the conversation, Wrobel stated that he could not represent Wylie. However, there is a dispute as to the time at which this exchange occurred. *Id.*[6]

■ Marley further argues that the attorney-client privilege was waived by statements Wylie made to MacDonnell. However the alleged statements by Wylie to MacDonnell that he resigned did not make his conversations with Wrobel any less private, nor constitute a waiver of the privilege.[7] In sum, we hold the trial judge's findings on the issue were not clearly erroneous and that the ruling granting the motion in limine was not in error or an abuse of discretion.[8]

### D.

In the event that Wylie prevails on the new trial, the issue of prejudgment interest raised by Marley would be presented again. Therefore we will address Marley's argument concerning the computation of prejudgment interest.

The jury awarded Wylie $1,329,424, which represented the total salary and benefits he would have received absent Marley's breach. On Wylie's motion, the district court amended the judgment, adding prejudgment interest from the date of the breach to the date judgment was entered on the total amount of the verdict in the amount of $341,705. 2 R.Doc. 139. Marley argues that the district court erred by awarding prejudgment interest on the total amount of the verdict because according to the Agreement, Wylie was only entitled to receive his annual salary payments as they became due. Marley further asserts because some of Wylie's payments had not become due at the time judgment was entered, Wylie's award of the prejudgment interest gave him more money than he would have been entitled to under the Agreement.

■ If Wylie prevails he would be entitled to prejudgment interest. His claim is liquidated. Section 16–201 of Kan.Stat. Ann. provides in part that "[c]reditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; . . ." This section is applicable to prejudgment interest awards involving liquidated claims. *Delano v. Kitch*, 663 F.2d 990, 1001 (10th Cir.1981), *cert. denied* 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982). In discussing when a creditor is entitled to prejudgment interest, the Kansas Supreme Court in *First National Bank of Girard v. Bankers Dispatch Corporation*, 221 Kan. 528, 562 P.2d 32 (1977), held:

> [A] claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same become definitely ascertainable by mathematical computation. Where an amount is due upon contract, either express or implied, and there is no uncer-

---

**6.** The district court determined that Wylie was not informed that Wrobel could not represent him until after Wylie "had spoken of his resignation." 2 R.Doc. 84, p. 5.

**7.** The district court addressed this issue and held that any comments to MacDonnell by Wylie about his alleged resignation were immaterial as to the issue concerning the attorney-client privilege between Wylie and Wrobel. Additionally, the trial court stated that even if Wylie

made such a statement to MacDonnell, it was not a waiver of the contents of the conversation Wylie had with Wrobel, but only a separate statement of a fact which did not divulge the contents of the Wylie–Wrobel conversation. 2 R.Doc. 84, p. 5.

**8.** Since the case is being remanded, for a new trial, we leave it to the trial court's discretion as to whether additional evidence need be taken concerning this evidentiary issue.

tainty as to the amount which is due or the date on which it becomes due, the creditor is entitled to recover interest from the due date.

*Id.* at 40. Therefore, the critical question for us to determine is at what point in time Wylie's claim becomes liquidated for purposes of calculating prejudgment interest.

 Marley asserts the district court was required to grant prejudgment interest in conformance with the terms of the Employment Agreement wherein Marley was to pay Wylie his annual salary in the event the Agreement was terminated. On the other hand, Wylie argues the liquidated amount became due for purposes of prejudgment interest when the company breached the agreement and he demanded continued payment in accordance with Paragraph 7(a), and when Marley refused to follow the provisions of Paragraph 7(a) for his payments. We are persuaded that the district court erred in including prejudgment interest in the amended judgment for payments which had not become due according to the Agreement.

Although Wylie is correct in asserting that Marley's breach of the Agreement included the provisions contained within Paragraph 7(a), this alone does not support his argument that the payments not yet due were accelerated and became part of the verdict for purposes of awarding prejudgment interest. Although we find no Kansas authority on point, we believe that Kansas in a case such as this, would hold that a claim becomes liquidated for prejudgment interest purposes when the total amount is due or, as here, when specific amounts prior to entry of judgment became due in semi-monthly amounts as the contract provided. *See First National Bank of Girard,* 562 P.2d at 40; *Hollwedel v. Duffy–Mott Co., Inc.,* 263 N.Y. 95, 188 N.E. 266, 268 (1933); RESTATEMENT (SECOND) OF CONTRACTS § 354(1) comment c, illustration 7 (1981).

We hold that Wylie was not entitled to prejudgment interest on the entire amount of the verdict as awarded. If Wylie prevails on retrial of the case, the district court shall calculate the prejudgment interest award to include interest on the amounts of semi-monthly payments and benefits from the various dates when due.

### IV.

Accordingly, we REVERSE the judgment on the contract claim and the declaratory judgment entered in favor of Wylie, and REMAND for further proceedings in accord with this opinion.