**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 12, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JASON BRETT MERIDA,

     Defendant - Appellant.

No. 15-7043

———————————————————

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:14-CR-00020-JHP-1)**
———————————————————

J. Lance Hopkins, Underwood Law Firm, Tahlequah, Oklahoma, for Defendant - Appellant.

Christopher Wilson, Assistant United States Attorney (Mark F. Green, United States Attorney, Linda A. Epperley and Douglas A. Horn, Assistant United States Attorneys, appearing with him on the brief), Muskogee, Oklahoma, for Plaintiff - Appellee.

———————————————————

Before **BRISCOE**, **LUCERO**, and **McHUGH**, Circuit Judges.

———————————————————

**McHUGH**, Circuit Judge.

———————————————————

# I. INTRODUCTION

Jason Brett Merida, the former executive director of construction for the Choctaw Nation of Oklahoma (the Nation), was convicted after a fifteen-day jury trial on six counts of a seven-count indictment. The indictment alleged Mr. Merida conspired to receive cash and other remuneration from subcontractors performing work on construction projects for the Nation, embezzled in excess of $500,000 by submitting and approving false subcontractor invoices, and willfully failed to report income on his federal tax returns for 2009 and 2010. Mr. Merida testified in his own defense at trial and, on cross-examination, prosecutors impeached his testimony using the transcript of an interview the Nation's attorneys had conducted with him as part of a separate civil lawsuit, before the initiation of these criminal proceedings. Mr. Merida objected to the use of the transcript and moved for mistrial, arguing the transcript was protected by the attorney-client privilege and its use prejudicially damaged his credibility with the jury. The district court denied his motion for a mistrial and the jury convicted Mr. Merida on all but one count. Mr. Merida timely appealed the trial judge's denial of his motion for mistrial. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

# II. BACKGROUND

## A. *Factual Background*

As the Nation's executive director of construction, Mr. Merida oversaw a period of significant growth in construction projects. Flintco Construction (Flintco) was the general contractor and program manager for all of the Nation's construction and remodeling projects, and Robert DeWayne Gifford was a project manager at Flintco.

Even though Builders Steel, a Tulsa, Oklahoma business owned and operated by Lauri Parsons, was on the Nation's list of preferred vendors, a Flintco project manager initially recommended a different steel subcontractor based on a lower cost estimate for the Nation's major expansion in casino construction. But Mr. Merida and Mr. Gifford overruled this initial recommendation, and Builders Steel became the steel subcontractor for all the Nation's building projects. Mrs. Parsons's husband, Brent Parsons, was the sales manager for Builders Steel.

## 1. Schemes and Fraud

Between 2009 and 2010, Mr. Merida was involved in three separate fraudulent schemes at the expense of the Nation. These schemes are detailed in the conspiracy counts of the Indictment and were referred to at trial as the Missouri Hunting/Worth Group Scheme, the Steel Fraud, and the Scott Rice Fraud. We adopt those descriptive references for purposes of our discussion.

### a. The Missouri Hunting/Worth Group Scheme

In November 2009, Mr. Merida went on a hunting trip to Missouri with Brian Fagerstrom, president of Worth Group Architects, and Builders Steel's Brent Parsons. Mr. Merida arranged for Worth Group to submit a false invoice for $200,000 to the Nation to cover the cost of the trip, including $160,000 for exotic animals they killed and related taxidermy work. Mr. Merida approved an increase in Worth Group's fee for upcoming work to cover this cost, which the Nation then paid.

3

### b.  The Steel Fraud

In December 2009, the Nation's Business Committee approved a proposal from Mr. Merida to prepurchase $10.5 million in steel allegedly left over from an abandoned Las Vegas casino project. Mr. Merida represented that the steel could be prepurchased at a 20% discount for use in future Nation construction projects based on Builders Steel's projection of an increase in steel costs in 2010. Mr. Merida recommended the purchase based on emails from Mr. Gifford and Mr. Parsons and a signed letter from Mrs. Parsons, even though the proposal quoted the $10.5 million purchase price without indicating the price per pound or the total quantity of steel purchased.

### c.  The Scott Rice Fraud

In September 2010, Elena Harris, the former chief financial officer for furniture store Scott Rice LLC reported to the FBI her suspicion that one of the store's sales executives, James Stewart, was engaging in fraudulent transactions with the Nation. This triggered a federal investigation that revealed a fraud scheme involving Mr. Merida, Builders Steel's Mr. Parsons, and Mr. Stewart in which they financed a hunting safari in Africa by submitting false invoices from the Scott Rice store totaling $345,000,[1] which were approved by Mr. Merida and Flintco's Mr. Gifford on behalf of the Nation.

---

[1] A significant portion of this amount was also used to buy furniture and rugs sent to the private residences of Mr. Parsons and Mr. Gifford.

## 2. The Nation's Discovery and Investigation of the Steel Fraud

After the Nation had paid approximately $9.25 million to Builders Steel,[2] tribal auditors discovered during an October 2010 visit to the Builders Steel storage yard that at least half of the allegedly prepurchased steel was missing. The Nation engaged Michael Burrage as its attorney to conduct an investigation and to pursue a civil action on behalf of the Nation against Builders Steel.

As part of that investigation, on November 19, 2010, tribal executives ordered Mr. Merida to appear in his capacity as the Nation's executive director of construction at Mr. Burrage's law office. Mr. Burrage and another Nation attorney told Mr. Merida when he arrived that a court reporter, who was also present, would be taking his sworn statement for the record.[3]

The interview transcript of Mr. Merida's "sworn statement" reflects the following discussion about the tribal attorneys' representation and the attorney-client privilege:

> BY MR. BURRAGE:
> Q. Jason, we've met. I'm Mike Burrage.
> A. Uh-huh
> Q. And Bob is—Rabon is here with me. And there has been a lawsuit filed by the Choctaw Nation of Oklahoma against Builders Steel in the District Court of Bryan County, Oklahoma. And we want to take your statement today—

---

[2] The Nation paid part of that amount through cash payments totaling $7.25 million and the rest by application of a $2 million credit for an oversupply of steel on another project.

[3] Mr. Merida alleges the attorneys "indicated to him that they were working on Merida's behalf as well as on the behalf of all members of [Nation Chief Pyle's] Administration" and that "the two tribal attorneys indicated to [Mr.] Merida that they were working on his side." But he has identified no record evidence, such as an affidavit or other sworn testimony, to support those allegations.

A. Uh-huh

Q. —in connection with that lawsuit. Okay.

A. Okay.

Q. Now, what we do here, today—for the purposes of the record, it's covered by the attorney/client privilege because you do work for the Choctaw Nation.

A. Uh-huh.

Q. And the Nation asserts any privilege—attorney/client privilege in connection with this statement.

And the other thing that we need in the record that—this—the taking of this statement is work product of the lawyers. In other words, what you say may not be the work product, but my questions to you are work product setting forth my mental processes and so forth.

A. Uh-huh.

Q. So it's the position of the Nation that this whole statement is privilege[d] and confidential.

A. Yeah.

Q. Is that okay with you?

A. Sure.

Q. And basically what we are trying to do is find out about the dealings between the Choctaw Nation, Builders—

A. Uh-huh.

Q. —and Flintco. Okay.

A. Okay.

The interview then proceeded. Mr. Merida stated under oath that he was not well acquainted with Brent Parsons of Builders Steel.

### 3. The Federal Investigation

The Nation's Chief and Assistant Chief asked Mr. Burrage to report the preliminary findings from his investigation to the U.S. Attorney's Office in Muskogee, Oklahoma. The ensuing federal investigation revealed the Nation had been overcharged and had received only a fraction of the steel that was actually purchased. The federal investigators also uncovered the Missouri Hunting/Worth Group Fraud and confirmed Elena Harris's suspicions about the Scott Rice Fraud.

6

Federal agents interviewed Mr. Merida on September 13, 2012. In that interview, Mr. Merida admitted accepting gifts and other benefits as part of these schemes, including two all-terrain vehicles, a Cadillac Escalade (for a price $55,000 lower than market value), a television, three stereo systems, numerous firearms, a golf vacation at Pebble Beach, and two hunting trips to Acoma, New Mexico, a trip to Puerto Vallarta, Mexico (with his wife), two Louis Vuitton purses, and a wallet.

After completing its investigation, the government filed criminal charges against Mr. Merida and other individuals involved in the fraudulent schemes. Every defendant, except Mr. Merida, entered a guilty plea before trial.

## 4. Trial Evidence of Other Benefits Received by Mr. Merida

Many of the defendants who entered guilty pleas testified at Mr. Merida's trial about his involvement in the fraudulent schemes. In addition, witnesses from other vendors testified about products and services they provided to Mr. Merida hoping to secure future business with the Nation. The benefits provided to Mr. Merida by these vendors included plumbing fixtures for his personal use valued between $32,000 and $35,000 and custom cattle guards for his home and his father-in-law's home, valued between $8,000 and $10,000.

### B. *Procedural Background*

## 1. Cross-examination and Motion for Mistrial

Mr. Merida testified in his own defense at trial. On cross-examination, the government used his sworn statement from the Nation's investigation for impeachment

purposes. The prosecutor asked a series of questions based on the transcript, and on two occasions quoted a portion of the transcript in framing the question:

Q. I'd direct counsel to Page 21, beginning Line Number 18.

Mr. Merida, I'm going to ask you whether these questions were asked and these answers given. "And Brent Parsons, what is his position with Builders Steel?" Answer: "I believe he's vice president." Question: "Now, did you—did—have you known him for some period of time?" Answer: "No. A year and a half, two years." Question: "At the time you received this email from DeWayne, did you know Brent?" And incidentally, the email that's referred to here is the email of December 2009 regarding the steel; isn't that correct?

A. I believe so.

Q. Question again: "At the time you received this email from DeWayne, did you know Brent?" Answer: "I knew who he was. We had met. I didn't know a whole lot about him." Were those questions asked and those answers given?

A. Yes.

Q. At the time that you said that, that was not true, was it?

A. No.

Q. . . . . I'm going to read for you, sir, some questions and answers, and ask you if these questions were asked and these answers given. "So this email that's marked as Exhibit 2, did it just come out of the blue?" Answer: "Yes. There was no warning, no information that it was coming or anything." Question: "Okay. So you get the mail—the email December the 3rd, 2009 at 2:47, and it looks like that Brent Parsons had sent this email to DeWayne about two minutes earlier, doesn't it?" Answer: "Yes, it does." Question: "So you get the email, no call or anything; right?" Answer: "Uh-huh." Question: "Is that right?" Answer: "That's right." Sir, were those questions asked and those answers given?

A. Yes, they were.

Q. When you told Mike Burrage that in November of 2010, that was a lie, wasn't it?

8

A. No.

Q. It was inaccurate, wasn't it?

A. It was inaccurate.

After the second quote from the transcript, Mr. Merida's counsel objected and requested a bench conference. He moved for a mistrial, arguing the transcript was protected by the attorney-client privilege because the Nation's attorneys were acting as Mr. Merida's counsel when they took his sworn statement in connection with the Nation's civil suit against Builders Steel. The district court overruled Mr. Merida's motion for a mistrial, finding as follows:

> I have reviewed the sworn statement of Jason Merida taken on the 19th day of November, 2010. . . . And my reading of the sworn statement of Mr. Merida, it was taken in anticipation of civil litigation, and that the privilege discussed here was a privilege of the tribe. . . .

> And if there is a privilege, the privilege would be the privilege of the tribe. So there's no privilege that impacts this defendant.

## 2. Jury Deliberation and Verdict

On November 20, 2014, the parties made their closing arguments, and the jury began its deliberations. At 10:05 p.m., the jury sent a note to the judge, stating "Your Honor, we can't agree on a single count. What are your directions?" Neither party objected to the court's decision to give the jury "a modified Allen instruction,[4] adjourn

---

[4] An "*Allen* instruction" takes its name from *Allen v. United States*, 164 U.S. 492 (1896), "in which the Supreme Court first approved a supplemental instruction given to a deadlocked jury." *United States v. McElhiney*, 275 F.3d 928, 935 (10th Cir. 2001). It is designed to urge jurors who feel they are at an impasse "to review and reconsider the evidence in the light of the views expressed by other jurors so as to avoid a mistrial,

9

for the evening, and ask the jury to reassemble at 8:30 in the morning and begin their

deliberations or continue their deliberations."

Shortly after receiving this further instruction that same evening, the jury passed

another note to the judge, stating "[w]e would like to vote one more time before the Court

adjourns." The judge allowed the jury to do so and five minutes later received another

note informing the court the jury had "reached a verdict on all counts." The jury found

Mr. Merida guilty on six counts and not guilty on a single count—Count 4, Conspiracy to

Commit Money Laundering. The district court subsequently sentenced Mr. Merida to 144

months' incarceration, two years' supervised release, restitution in the amount of

$577,149.00, and $600 in special assessments.

Mr. Merida appeals, challenging only the district court's denial of his motion for

mistrial.

### III.  DISCUSSION

We review the district court's disposition of a motion for mistrial for an abuse of

discretion. *United States v. Morgan*, 748 F.3d 1024, 1041 (10th Cir. 2014); *United States

v. Gabaldon*, 91 F.3d 91, 94 & n.2 (10th Cir. 1996).[5] A motion for mistrial "call[s] for an

---

provided that the instruction does not impose such pressure on the jury such that the
accuracy and integrity of the verdict becomes uncertain." *United States v. Sharp*, 749
F.3d 1267, 1283 (10th Cir. 2014). An instruction, like the one used by the district court
here, that departs by omission or embellishment from an instruction that tracks the
instruction approved by the Supreme Court in *Allen* is generally referred to as a
"modified *Allen* instruction." *McElhiney.* 275 F.3d at 936. Mr. Merida has not challenged
the modified *Allen* instruction, but claims the jury's apparent impasse is relevant to the
issues on appeal. We address this argument in the Discussion section below.

[5] The government argues that plain-error review should apply because Mr.
Merida's counsel failed to timely object to use of the transcript on cross-examination. *See*

examination of the prejudicial impact of an error or errors when viewed in the context of an entire case." *Gabaldon*, 91 F.3d at 94. Mr. Merida challenges the district court's denial of his motion for mistrial in response to the government's use, on cross-examination, of the transcript of his sworn statement to Mr. Burrage in the separate civil litigation. Mr. Merida argues that (A) using the transcript violated his attorney-client privilege, and (B) use of the transcript fatally damaged his credibility with the jury. We review the district court's ruling on attorney-client privilege for abuse of discretion, but "[u]nderlying factual determinations are reviewed for clear error and purely legal questions are reviewed de novo." *See In re Grand Jury Proceedings*, 616 F.3d 1172, 1182 (10th Cir. 2010).

## A.   *The Nation Waived its Privilege*

The district court determined that Mr. Merida could not assert a privilege as to the transcript of his interview with the Nation's attorneys because the Nation, which held the privilege, had waived it. But Mr. Merida argues he reasonably believed Mr. Burrage was *his* attorney and that *his own* statements would therefore be protected by the attorney-client privilege running between him and Mr. Burrage. Mr. Merida notes that after identifying himself as counsel for the Nation, Mr. Burrage stated, "what we do here, today—for the purposes of the record, it's covered by the attorney/client privilege because you do work for the Choctaw Nation." In Mr. Merida's view, "given [Mr.]

---

*United States v. Taylor*, 514 F.3d 1092, 1095–96 (10th Cir. 2008). Because Mr. Merida's claim fails under either standard, we assume for purposes of our analysis that the objection was timely and review for abuse of discretion.

11

Burrage's express statement to [Mr. Merida] that their entire conversation would be covered by the attorney-client privilege, the only reasonable conclusion from the perspective of [Mr.] Merida, a layman, was that his statements to [Mr.] Burrage were so privileged." But Mr. Burrage further explained that "*the Nation* asserts any privilege— attorney/client privilege in connection with this statement. . . . So it's the position of the Nation that this whole statement is privilege [sic] and confidential." More importantly, Mr. Merida's position is untenable under our controlling precedent.

"A party claiming the attorney-client privilege must prove its applicability, which is narrowly construed." *Foster v. Hill (In re Foster)*, 188 F.3d 1259, 1264 (10th Cir. 1999). "In order to be covered by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy *sought by the client*." *United States v. Johnston,* 146 F.3d 785, 794 (10th Cir. 1998) (emphasis added). And "for purposes of the attorney-client privilege, the 'client' is 'the actual recipient of the services.'" *Id.* at 795 (quoting 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 503.11[2] (2d ed. 1998)). Moreover, "[a]ny privilege resulting from communications between corporate officers and corporate attorneys concerning matters within the scope of the corporation's affairs and the officer's duties *belongs to the corporation and not to the officer*." *Intervenor v. United States (In re Grand Jury Subpoenas)*, 144 F.3d 653, 658 (10th Cir. 1998) (emphasis added). Thus, a corporate officer "has no power to assert the attorney-client privilege except as to confidential communications with [the corporation's attorneys] in his individual capacity." *Id.* And

12

"[a] personal privilege does not exist merely because the officer 'reasonably believed' that he was being represented by corporate counsel on an individual basis." *Id.* at 659.

Corporate employees who nevertheless claim the corporation's counsel represented them individually must satisfy the following five elements:

> First, they must show they approached counsel for the purpose of seeking legal advice. Second, they must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with counsel were confidential. And, fifth, they must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company.

*Id.* (internal brackets omitted) (quoting *In re Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120, 123 (3d Cir. 1986)). In *Intervenor*, we held an executive officer of a hospital had sufficiently made this showing because *the officer* had sought out the advice of the hospital's attorneys specifically in his individual capacity, confidential communications had occurred, and the lawyers recognized a potential conflict of interest. *Id.* And we clarified that "[o]ur holding is an extremely limited one," which "includes only that very small portion of communications in which [the executive officer] sought legal advice as to his personal liability without regard to any corporate considerations." *Id.*

Mr. Merida has made no attempt to show that his statements during the interview are protected by the attorney-client privilege despite the fact that he was a corporate officer of the Nation engaged in the Nation's business. And our application of the *Bevill*

13

test confirms the district court's conclusion that Mr. Merida did not have an attorney-client privilege with respect to his interview statements.

First, Mr. Merida concedes he spoke with Mr. Burrage because the Nation had instructed him to do so, not on his own initiative to seek legal advice. *See Wylie v. Marley Co.*, 891 F.2d 1463, 1471 (10th Cir. 1989) ("The professional relationship for purposes of the privilege hinges upon the belief that one is consulting a lawyer and his intention to seek legal advice."). Mr. Merida argues in his Reply Brief that he believed he was consulting a lawyer who represented him when he visited Mr. Burrage's office. But he does not argue that in reporting to Mr. Burrage's office as directed by the Nation, he did so with the "intention to seek legal advice," *id.* at 1471, or that, as required by the second *Bevill* factor, he "made it clear that [he was] seeking legal advice in [his] individual rather than in [his] representative capacit[y]." *Intervenor*, 144 F.3d at 659 (quoting *Bevill*, 805 F.2d at 123). Third, Mr. Merida fails to demonstrate that Mr. Burrage agreed to communicate with Mr. Merida in his individual capacity, despite the possibility of a conflict with his representation of the Nation. *Id.* And even if Mr. Merida could show, as required by the fourth *Bevill* factor, that his statements were confidential, he cannot establish the final requirement that "the substance of [his] conversations with [counsel] did not concern matters within the [Nation] or the general affairs of the [Nation]." *Id.* Under these circumstances, the attorney-client privilege belonged to the Nation, not to Mr. Merida.

Nevertheless, Mr. Merida points us to a number of decisions he contends dictate a contrary result. But none of them supports Mr. Merida's argument. To begin, Mr.

Merida's reliance on *Upjohn Co. v. United States*, 449 U.S. 383 (1981), is misplaced. In *Upjohn*, employees' communications with corporate counsel in an internal investigation "were considered 'highly confidential' when made *and [had] been kept confidential by the company*." 449 U.S. at 395 (emphasis added) (citation omitted). In contrast, the Nation did not keep Mr. Merida's interview statements confidential; instead it chose to disclose this particular communication to the government, thereby intentionally waiving the privilege. *In re Grand Jury Proceedings*, 616 F.3d 1172, 1184 (10th Cir. 2010) ("Because confidentiality is the key to maintaining the attorney-client privilege, a party waives the privilege when he voluntarily discloses to a third party material or information that he later claims is protected.")).

In *United States v. Bauer*, which Mr. Merida also cites, the attorney gave confidential legal advice to the defendant in his individual capacity. 132 F.3d 504, 508–09 (9th Cir. 1997). But as indicated above, there is no evidence that Mr. Burrage provided legal advice to Mr. Merida in his individual capacity. And in *Frontier Refining, Inc. v. Gorman Rupp Co., Inc.*, we held a refinery operator had not automatically waived its attorney-client privilege as to materials documenting a settlement with personal injury plaintiffs by bringing a civil indemnity action against the manufacturer of pumps that allegedly caused the fire at the refinery during which the settling plaintiffs had been injured. 136 F.3d 695 (10th Cir. 1998). Here, there is no issue of automatic waiver. The Nation intentionally waived its attorney-client privilege as to the transcript by providing it to the government. Finally, Mr. Merida points us to *United States v. White*, 887 F.2d 267 (D.C. Cir. 1989). But *White* involved direct testimony by an attorney against *his own*

*client*. 887 F.2d at 270. Allowing the testimony in such a situation "would deter individuals from consulting with their lawyers to ascertain the legality of contemplated actions." *Id.* Here, Mr. Burrage represented the Nation and told Mr. Merida he represented the Nation, and the record is devoid of any evidence that Mr. Merida consulted Mr. Burrage individually to ascertain the legality of any contemplated actions.[6]

In summary, Mr. Merida has failed to establish he is the "client" who holds the attorney-client privilege because he has not shown by affidavit, declaration, or testimony that the Nation's corporate counsel represented him individually in addition to representing the Nation. Rather, the Nation was the client holding the privilege, and it intentionally waived the privilege by providing the transcript to the government. The district court therefore did not abuse its discretion in denying the motion for mistrial as a result of the use of the transcript during Mr. Merida's cross-examination.

## B.  *Harmless Error*

Even if Mr. Merida could establish that he held the attorney-client privilege as to the interview transcript, he has failed to show prejudice resulting from its brief use on cross-examination. As noted, we must evaluate a motion for mistrial for abuse of discretion based on our "examination of the prejudicial impact of an error or errors when

---

[6] Indeed, defense counsel acknowledged that Mr. Burrage was acting as counsel for the Nation during the interview. When attempting to impeach FBI Special Agent Youngblood with the interview transcript, Mr. Merida's counsel stated, "Mike Burrage, on behalf of the Choctaw Nation *as their lawyer*, did an internal investigation. . . . Our guy shows up at the office, and Mike is there with a court reporter and starts asking a lot of questions, a lot of them accusatory. . . . Mike was . . . leading up that internal investigation . . . *as a lawyer for the Choctaws*."

viewed *in the context of an entire case.*" *United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996) (emphasis added).

Mr. Merida argues the use of the transcript undermined his credibility with the jury and that this was the decisive factor that caused it to convict him on six of the seven counts. He further contends the "trial was close, as evident by the jury's acquittal on one count and near deadlock or hung jury." Mr. Merida bases this argument on the syntax of the jury's note to the court at the end of the first evening of deliberations: "Your Honor, we can't agree on a single count. What are your directions?" In Mr. Merida's interpretation, the jury's note meant that it was hopelessly deadlocked and could not agree on anything. But subsequent events strongly undermine Mr. Merida's interpretation.

After the judge gave the modified *Allen* instruction and informed the jury they could begin afresh in the morning, the jury immediately passed another note to the judge, stating "We would like to vote one more time before the Court adjourns." Five minutes after the judge allowed this, the jury again sent a note to the Judge, stating "Your Honor, we have reached a verdict on all counts." The jury then returned its verdict, finding Mr. Merida guilty on six of the seven counts. This sequence of events strongly suggests that the jury's initial note intended to convey their inability to reach agreement on only one of the seven counts—a "single count." The return of a unanimous verdict on all seven counts only five minutes after being permitted to take a final vote makes Mr. Merida's interpretation—that the jurors were deadlocked on all seven counts—highly implausible.

17

Further, our independent review of the record convinces us that this was not a close case. Rather, the evidence of Mr. Merida's guilt was overwhelming. Other participants in the fraud admitted their complicity and provided detailed testimony about Mr. Merida's involvement. The prosecution also presented extensive documentary evidence. And the government introduced testimony from the government agents relating Mr. Merida's admissions of guilt to them during their investigation. The government's use of the transcript to impeach Mr. Merida was insignificant in comparison to the extensive evidence of guilt. It comprises only seven pages in a trial transcript nearly 5,000 pages long, an exchange that would have taken only a few minutes out of the fifteen days of testimony. The impact of the impeachment was also minimal. Essentially, the cross-examination highlighted that Mr. Merida had mischaracterized the closeness of his relationship with Brent Parson of Builders Steel when he was interviewed by Mr. Burrage. Although this may have had some impact on the jury's view of Mr. Merida's credibility, it was relatively weak impeachment material. And in light of the testimony from numerous witnesses about Mr. Merida's solicitation and approval of false invoices and fraudulent acceptance of hundreds of thousands of dollars of goods and services, we are not convinced it could have so damaged Mr. Merida's credibility as to change the outcome of the trial.[7]

---

[7] As the government observes, Mr. Merida testified in his own defense in an unsuccessful attempt "to contradict the mountain of evidence against him stemming from the testimony of 19 government witnesses, the content of over 180 documentary exhibits, his own prior admissions to government agents[,] and the admissions of all his co-conspirators."

Accordingly, even if Mr. Merida had held an attorney-client privilege as to the interview transcript—which he did not—any error in allowing the government to introduce it for impeachment purposes was harmless "when viewed in the context of an entire case." *Gabaldon*, 91 F.3d at 94. Thus, the district court did not abuse its discretion in denying the motion for a mistrial.

## IV.  CONCLUSION

We **AFFIRM** the district court's denial of Mr. Merida's motion for mistrial because the attorney-client privilege belonged to the Nation, which had intentionally waived it by providing the interview transcript to the government. Alternatively, even if Mr. Merida could establish an individual attorney-client privilege, any error in allowing the government's brief reference to it while cross-examining Mr. Merida was harmless in the overall context of the case. Accordingly, the district court did not abuse its discretion in denying the motion for mistrial.

15-7043, <u>United States v. Merida,</u>

**LUCERO**, J. concurring.

I join the majority opinion in full, but wish to make a brief point regarding the potential for corporate attorneys to mislead employees. Merida argues that the attorneys caused him to subjectively believe that a privilege applied. The majority implicitly rejects this argument. I write separately to make that rejection explicit.

We have held that a "personal privilege does not exist merely because the officer reasonably believed that he was being represented by corporate counsel on an individual basis." <u>In re Grand Jury Subpoenas</u>, 144 F.3d 653, 659 (10th Cir. 1998). But we have not considered the situation before us here: at Merida's deposition, counsel for the Nation stated the conversation was "covered by the attorney/client privilege because you do work for the Choctaw Nation." Thus, the question becomes whether a corporate attorney's statements arguably suggesting to a reasonable layperson that a personal privilege exists may trigger the privilege. Assuming without deciding that such communications <u>could</u> trigger the privilege, I nevertheless reject Merida's contentions that: (1) the attorney's comments would have led a reasonable layperson to believe that the privilege applied; and (2) Merida subjectively believed the privilege applied.

Considering the attorney's comments in isolation, I agree that a layperson might have missed the nuance that the Nation, and not Merida, held the privilege. Attorneys should be more precise in their explanations. However, the circumstances surrounding the conversation demonstrate it would be unreasonable for Merida to believe the conversation was privileged. Merida spoke to the attorneys only because his superior

sent him to do so, and the attorneys told him that the purpose of the conversation was to aid the Nation in an ongoing civil trial. Thus, it would be unreasonable to interpret the attorney's statements as suggesting that Merida could decide which of his statements could be used in that investigation or referenced in that trial.

Moreover, Merida's statements to the attorneys demonstrate that he did not believe the privilege applied, in part because his statements were false. Cf. United States v. Zolin, 491 U.S. 554, 562 (1989) ("[C]ourts long have viewed [the attorney-client privilege's] central concern as one to encourage full and frank communication between attorneys and their clients . . . . That purpose, of course, requires that clients be free to make full disclosure to their attorneys of past wrongdoings." (quotations omitted)). We need not address whether the privilege would apply had Merida been truthful in his responses. Merida's dishonesty demonstrates that he did not subjectively believe he held an attorney-client privilege or that his statements would remain confidential.

Neither the majority nor I suggest a precise rule as to when a corporate attorney's implication that a personal privilege exists would raise a legal bar to introduction of an employee's statements in criminal proceedings. Whichever test applies, Merida's argument fails.